CATEX VITOL GAS, INC.,
Plaintiff, Appellee,

v.

Stephen Ray WOLFE, Defendant,
Appellant.

Michael R. Kutsch, Defendant,
Appellee.

No. 98–1840.

United States Court of Appeals,
First Circuit.

Heard Jan. 7, 1999.

Decided June 2, 1999.

Pascal Paul Piazza, with whom Maurice Bresenhan, Jr. and Zukowski & Bresenhan, L.L.P. were on brief, for appellant.

Nicholas T. Christakos, with whom Joel E. Hoffman, Gail L. Westover, Sutherland Asbill & Brennan LLP, Joan M. Griffin and Casner & Edwards were on brief, for appellees.

Before SELYA, Circuit Judge, CUDAHY,* Senior Circuit Judge, and STAHL, Circuit Judge.

CUDAHY, Senior Circuit Judge.

In 1994, Catex Vitol Gas, Inc.(CVG) fired one of its executives, Stephen Wolfe. Wolfe now appeals two orders granting summary judgment to CVG and its president, Michael Kutsch, on claims and counter-claims related to his termination. We affirm both orders.

## I.

In 1991 Catamount, a Massachusetts natural gas company owned by Kutsch, hired Wolfe to open and manage a branch office in Houston. With the advice of counsel, Wolfe negotiated and signed an employment contract. The particulars of this contract are at issue here, so we recite them with some specificity.

Wolfe agreed to serve as a company Vice President from March 1, 1991 until February 28, 1992 (Initial Employment Period). According to § 3 of the contract, Wolfe's tenure would "continue from year to year thereafter and [could] be canceled by [Wolfe] upon thirty days prior written notice." In consideration of his services, the company paid Wolfe a $100,000 yearly base salary. Any increase in salary or additional compensation, such as a bonus, was at the "sole discretion" of the company's Board of Directors.

The contract also outlined termination processes. Section 7.2 allowed Wolfe to terminate his employment "upon the expiration of the Initial Employment Period in

* Of the Seventh Circuit, sitting by designation.

accordance with the terms of this Agreement." Section 7.1 permitted the company to end the relationship

(a) upon the expiration of the Initial Employment Period in accordance with the terms of this Agreement, (b) at any time without notice for "cause" as defined below, (c) at any time without notice without cause, subject to section 7.5 below, (d) upon the death of the Employee, or (e) in the event of the Employee's disability . . .

Section 7.5 then defined what compensation would be due Wolfe upon termination of his employment. It provided in full:

Upon termination of the Employee's employment with the Company in accordance with clause (a), (b), (d) or (e) of Section 7.1, all compensation and benefits under this Agreement will cease, effective the date of termination. Upon termination of the Employee's employment with the Company in accordance with clause (c) of Section 7.1 prior to March 1, 1992, ("the Guaranteed Payment Date"), the Employee will be paid his Base Salary through such Guaranteed Payment Date in accordance with the Company's ordinary payroll practices. Upon termination of the Employee's employment with the Company in accordance with clause (c) of Section 7.1 after the Guaranteed Payment Date, the Employee will be paid his Base Salary for thirty days after such termination in accordance with the Company's ordinary payroll practices. Other than as specifically set forth in this Section 7.5 or as otherwise required by law, the Employee will not be entitled to receive any compensation or benefits after termination of his employment with the Company.

The contract also contained an integration clause, § 11, which provided:

This Agreement constitutes the entire Agreement between the parties with regard to the subject matter hereof, superseding all prior understandings and agreements, whether written or oral.

This Agreement may not be amended or revised except by a writing signed by the parties.

Wolfe's tenure at Catamount proceeded without incident through the Initial Employment Period. Wolfe traded natural gas for the company out of its Houston office and frequently traveled to Boston to confer with colleagues. In 1992, the company, by this time re-named Catex Energy Inc., instituted a Bonus and Guaranty Plan (BGP) to provide "an incentive to selected key employees of the Company similar to that to be derived from holding shares of the common stock, no par value per share ("Common Stock"), of the Company, but without transferring to such employees ownership of any capital stock of the Company." The BGP is also at issue here, so we limn its particulars as well.

The BGP allowed Kutsch to designate participants for a given fiscal year and required each Participant to execute an Accession Agreement for that year. Section 2(a) stated that "No ownership of any capital stock of the Company will be transferred or otherwise granted to any employee of the Company as a result of the designation or participation of such employee as a Participant." In the event of the sale of "all of the outstanding Common Stock of the Company," § 4(a) entitled BGP Participants to some compensation which was to be determined by a precise formula. Section 11(d) further provided that if the BGP were terminated prior to the end of a fiscal year and § 4(a)'s stock sale compensation provision were triggered within a year of that termination, Participants would be entitled to compensation as specified. Kutsch designated Wolfe as a BGP Participant for the fiscal year 1992, and on June 12, 1992, Wolfe executed an Accession Agreement in accordance with the terms of the BGP. Wolfe never signed an Accession Agreement for the fiscal year 1993.

On July 31, 1993, Kutsch sold 51 percent of Catex's outstanding stock, all of which

he owned, to Vitol Holding SARL. Prior to the closing and to facilitate the deal, on July 29, 1993, Wolfe signed a Release and Waiver in which Kutsch agreed to forgive a $25,000 balance on a personal loan, and Wolfe "irrevocably release[d] and discharge[d] each of the Company, Kutsch and Vitol from any and all liability of whatever description under or in connection with the [BGP]." In the Release, Wolfe acknowledged that he had reviewed acquisition documents which provided for a $1,000,000 payment to Kutsch, $75,000 of which was intended to be divided among the three former BGP Participants. Paragraph 1(e) of the Release provided:

> The Acquisition does not constitute a Stock Sale (as defined in the [BGP]) or any other event or type of transaction contemplated by the [BGP] to require any payment to Participants. Moreover, neither the undersigned nor any other person has been designated as a Participant under the Plan for the Company's fiscal year ending December 31, 1993. Nevertheless, Kutsch and the Company have determined to treat the [$75,000] as if it were being paid pursuant to the [BGP] and have undertaken in negotiating the [Acquisition] to ensure continuation after the Acquisition of the Company's informal discretionary bonus program for key employees in a manner consistent with the company's past practice.

In addition to signing this Release and Waiver, Wolfe initialed paragraph 1(e). He consulted an attorney before executing this Release.

At a CVG Board of Directors Meeting on December 9, 1993, the four attendees, one of whom was Kutsch, discussed a Bonus/Incentive Plan (BIP) for 1994. The proposed program, outlined in a short memo for the meeting, involved a cash component linked to CVG's income, a deferred component vesting over four years and a stock component allowing Kutsch to grant CVG employees options to purchase his stock in the company. The minutes of this meeting indicate that the Board of Directors believed that these proposals would create an incentive for "key senior employees" to stay with the company. The Board apparently "agreed" to the bonus terms as outlined in the proposal memorandum. Nothing in the record indicates whether CVG actually implemented the BIP or any of its several components.

Wolfe claims that in February or March 1994, Kutsch approached him about devoting more of his time to developing new business. In return, according to Wolfe, Kutsch promised Wolfe a new method of compensation. Wolfe alleges that he and Kutsch entered into an oral agreement, which changed Wolfe's bonus package by adding a "profit center" component, a "new bonus" concept and a vested ownership interest. These elements, according to Wolfe's description, roughly correspond to the three component parts of the BIP. This agreement also allegedly made parts of Wolfe's annual bonus mandatory rather than discretionary. Wolfe claims that, in reliance on this oral contract, he largely abandoned the client base he had spent three years developing in order to concentrate on bringing in new business for CVG.

On March 28, 1994, CVG fired Wolfe without cause. This termination was governed by § 7(c) of Wolfe's original employment contract which mandated that CVG pay Wolfe thirty days' base salary as severance pay. CVG paid Wolfe ninety days' severance and offered to determine at the end of fiscal year 1994 whether Wolfe should receive a bonus for the three months of work before his termination. Although his written contract did not so require, CVG eventually granted such a bonus to Wolfe.

Apparently anticipating Wolfe's dissatisfaction with this severance package, CVG filed a declaratory judgment action in Massachusetts state court seeking a determination that it did not owe Wolfe anything more. Citing diversity of citizenship, 28 U.S.C. § 1332, Wolfe removed the case to federal court and counter-claimed against

CVG and Kutsch.[1] Wolfe first alleged that CVG had breached a contract by failing to pay him the additional compensation Kutsch had orally promised. Wolfe also stated a claim sounding in fraud related to the Release and Waiver, contending that Kutsch had misrepresented the value of the acquisition and fraudulently induced Wolfe to abandon his stock rights under the BGP. CVG moved for summary judgment on both its original action and Wolfe's counter-claims. In an order dated June 27, 1997, the district court granted CVG's motion with respect to Wolfe's breach count. The court held that it could not enforce an oral modification of a fully-integrated, written employment contract. The court allowed discovery into Wolfe's fraud allegation. About a year later, in an order dated June 10, 1998, the district court granted the remainder of CVG's motion for summary judgment. It found that Wolfe could have suffered no injury from the alleged fraud because, under the BGP and pursuant to the Release, he owned no stock rights. Wolfe appeals both orders.

## II.

■ We review an order of summary judgment *de novo*, employing the same standards as the district court and viewing all facts in the light most favorable to the non-moving party. *See, e.g., Hinchey v. NYNEX Corp.*, 144 F.3d 134, 140 (1st Cir. 1998). To survive a summary judgment motion, the non-moving party must produce sufficient evidence to raise a genuine issue of material fact. *See* Fed.R.Civ.P. 56(e).

### A. Enforcement of the Oral Modification

Wolfe first challenges the district court's refusal to enforce the alleged oral modifi-

cations of his employment contract. He asserts, in sum, that CVG owes him money pursuant to his agreement with Kutsch, which involved a profit center, a new bonus structure and a vested ownership interest. The district court looked to the four corners of the contract, several provisions of which, it found, precluded enforcement of the alleged promises for additional pay. Section 7.5, for example, provides that if Wolfe were terminated without cause (as defined in § 7.2(c)) after the Initial Employment Period, as he was, then CVG owed him only thirty days' base salary (it paid him ninety days') and any other compensation expressly included in the written contract. The district court found no evidence that Wolfe's alleged bonuses had been incorporated in writing in the contract. Further, § 3 provided that all forms of compensation other than base salary were at the sole discretion of the Board of Directors. Similarly, because none of the other alleged modifications was in writing, and § 11 of the contract expressly required modifications to be in writing, the district court refused to enforce them. Wolfe now calls the district court's strict reliance on the language of the employment contract an "unfounded legal fiction." Appellant's Br. at 25; *see also* Appellant's Reply Br. at 2.

■ Under the principles of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), Texas law supplies the substantive framework for determining whether the district court's approach was as fanciful as Wolfe claims.[2] As a federal court sitting in diversity, it is, of course, our task to interpret and apply as best we can the state rules of decision. *See, e.g., Blinzler v. Marriott Int'l, Inc.*, 81 F.3d 1148, 1151 (1st Cir.1996). Relying on

---

1. Wolfe's counter-claim stated a variety of causes of action and "defenses" related to an assortment of alleged wrongs. Most of these claims have been dropped, dismissed or abandoned. We consider only the two claims for which we believe Wolfe has preserved his appellate rights.

2. The district court, applying Massachusetts choice-of-law principles, concluded that, because Wolfe would perform the contract in Texas, Texas law governed issues of contract interpretation. We accept this analysis.

pronouncements of the state supreme court and, if these are not conclusive, on other instructive sources, ultimately "our task is to ascertain the rule the state court would most likely follow under the circumstances, even if our independent judgment on the question might differ." *Id.* So guided, we beat our way through the thicket of Texas contract law to determine the validity of Wolfe's charge.

 Wolfe would plunge us deep into this briar patch by raising various complicated issues of contract interpretation. He would lead us close to cases limiting the significance of integration clauses[3] and canceling the strictures of the Statute of Frauds.[4] But we cannot be waylaid by such thorny issues; there is a clearer path, and, although we could pick our way over Wolfe's obstacle course, we take the safer route.

 Thus, the alleged oral modifications are unenforceable because they are not sufficiently definite to supply the terms of a valid contract. The terms of an alleged oral modification to an employment contract must be definite enough to allow a court to know what it is being asked to enforce. *See, e.g., Montgomery County Hosp. Dist. v. Brown,* 965 S.W.2d 501, 502 (Tex.1998); *Hathaway v. General Mills, Inc.,* 711 S.W.2d 227, 228–29 (Tex.1986); *Botello v. Misener–Collins Co.,* 469 S.W.2d 793, 795 (Tex.1971). "General statements" and "[g]eneral comments" will not do; an employee "cannot construct [a formal agreement] out of indefinite comments, encouragements, or assurances." *Montgomery County,* 965 S.W.2d at 502. "In order to be legally binding, a contract must be sufficiently definite in its terms so that a court can understand what the promisor undertook." *T.O. Stanley Boot Co., Inc. v. Bank of El Paso,* 847 S.W.2d 218, 221 (Tex.1992).

Here, the district court's characterization of Wolfe's breach claim as "convoluted" is a masterpiece of understatement. Even giving all reasonable inferences to Wolfe, as we must do on summary judgment, the terms of the alleged oral modification are so indefinite and uncertain that Wolfe himself was unable to articulate exactly what he was owed and under what formula the extent of the deficit could be calculated. His deposition testimony is

---

**3.** Section 11 of Wolfe's contract requires that any modifications to the terms of his employment be in writing and signed by both parties. Texas courts, however, will sometimes enforce oral modifications of written contracts that include integration clauses. *See, e.g., Mar–Lan Indus., Inc. v. Nelson,* 635 S.W.2d 853, 855 (Tex.Ct.App.1982); *Hoff v. Computer Assoc. Int'l, Inc.,* No. Civ.A. 3–96–CV–2679R, 1997 WL 528059, at *5 (N.D.Tex. Aug. 18, 1997).

**4.** If the Texas Statute of Frauds, Tex Bus. & Com. § 26.01, requires that the original contract be in writing, and the oral modification does not alter the character or value of the consideration, then Texas courts will enforce the modification. *See Horner v. Bourland,* 724 F.2d 1142, 1148 (5th Cir.1984) (interpreting Texas law and collecting cases). Here, if the Statute had required Wolfe's original employment contract to be in writing, Texas courts would surely have refused to enforce the oral modification on the ground that it changed both the character and the value of the consideration originally contracted for. Wolfe claims, after all, that he is due more money (value) because the bonus structure was orally modified to be mandatory rather than discretionary (character). *See id.* As might be expected, the parties vigorously dispute the applicability of the Statute to the original employment contract. We need not reach this issue, however, because we find that the alleged oral modifications to this original contract are unenforceable on their face.

If oral modifications to written contracts are themselves subject to the Statute of Frauds, then Texas courts will not enforce them. *See, e.g., Garcia v. Karam,* 154 Tex. 240, 276 S.W.2d 255, 256–57 (Tex.1955). We note in passing that the terms of the alleged "profit center" are so ill-defined that we cannot determine whether it is capable of being performed within a year and therefore outside the Statute. From what we know of the new bonus and vested ownership interest components, apparently they could not have been performed within one year. This is an alternative ground for holding that these oral modifications to Wolfe's contract are unenforceable.

**578**

telling.[5] CVG questioned Wolfe about the basis for his claim that he was owed bonus compensation:

Q. Your claim for bonus, is that related to this written employment agreement?

A. Yes.

Q. Is your claim for a bonus related to any other agreement?

A. The agreement we talked about the profit center agreement.

Q. Anything other than that?

A. Not under claim for bonus, no.

Q. And then you say there's a profit center agreement. Is that separate from the bonus?

A. No. That's the same type program .... when Mr. Kutsch asked me to go out and seek a lot of new business on behalf of the company, he never predicated my payment of bonus based upon the total earnings of the corporation. I was told I would be paid based on my contribution to the company....

App. 125–26. Wolfe's deposition testimony regarding his understanding of the new bonus component was in the same vein:

A. That particular program was an additional incentive compensation program very similar to the program in place at Vitol. It was fashioned after the Vitol plan, which effectively was a vesting program. For example, if my proportionate share of earnings amounted to $100,000 over and above my participation in the bonus plan, that $100,000 would be put into [sic] my name in the vested program, of which I would receive 25 percent in four annual installments, and that would also be terminated at any time if I left the company. I would be—there would always be three years' payments that I would never recover if I ever

left. So in effect over a period of time—let's say if you had four years in a row, I mean, there could be sizeable sums of money built up in a deferred account that if you ever left the company you would walk away from. The effect of the program, to my understanding, was to make sure that the employees had significant incentive not to leave the company.

Q. How would it be determined how much money any one person would be entitled to under that?

A. I don't recall specifically the allocation procedures. I believe it was 10 percent of the net income. 10 to 20 percent of the net income of the company was allocated to this type of program. This is in addition to other bonus programs.

Q. This is apart from the bonus concept?

A. That's correct.

Q. Under this program, as you think you understand it, when would the first payment have been made if you had remained with Catex?

A. I believe the first payment would be due at the end of 1994.

Q. And can you tell me again, as best you can, how that payment would be determined?

A. I don't recall specifically. I think I gave you an adequate explanation.

App. 129–30. The questioning continued, and Wolfe was unable to be any more precise about the specifics of the contract he was seeking to enforce.

The documents are similarly devoid of detail. The memorandum—entitled a "Proposed ... Plan"—simply outlined scales. For example, 25 percent of the deferred component (what Wolfe calls the new bonus) would vest each year for four years from the grant. The minutes from

**5.** The record on appeal includes only those excerpts of Wolfe's deposition testimony supplied by the parties in connection with vari- ous court filings. However, this is sufficient for our purposes.

the Board of Directors meeting at which the BIP was discussed indicate only that the Board "agreed" to the proposed scale as a means of creating an incentive for certain employees. Nothing in any document specifies what would be paid to whom and when it would be paid.[6] More, there is no evidence to suggest that CVG took any steps to provide for the implementation of any of the components of the BIP outlined in the memorandum. The briefs and filings below are also less than illuminating.

 In order to enforce the oral modifications, Wolfe asks us to fill in critical details. We would have to decide, for example, what percentage of CVG's net income between 10 and 20 percent would be allocated to the bonus program and, based on his "contribution to the company," what part of that allotment CVG owed Wolfe. This we cannot do. In the end, all of the sources which might flesh out the terms of his alleged oral contract—Wolfe's recollection of the specifics of his agreement with Kutsch, the BIP memo, minutes from Board of Directors meetings, etc.— provide nothing more than general and indefinite comments. Wolfe cannot forge a contract out of such hazy materials. *See, e.g.*, *Montgomery County*, 965 S.W.2d at 502; *Hathaway*, 711 S.W.2d at 228–29. Accordingly, the oral modifications are unenforceable. We therefore affirm the district court's order of summary judgment in favor of Kutsch and CVG and against Wolfe on Wolfe's breach counter-claim.[7]

## B. Fraud in the Sale of Stock Rights

 We also affirm the grant of summary judgment against Wolfe on Wolfe's fraud counter-claim. Wolfe alleges that Kutsch fraudulently represented that Kutsch's sale of 51 percent of his stock in the company would yield only $1 million when it in fact resulted in Kutsch's receiving more than $10 million. Wolfe claims that, in reliance on these false representations and under pressure from Kutsch, he executed the Release and Waiver. In so doing he allegedly relinquished his 2.5 percent stock interest in CVG for substantially less than its true value. The district court examined the language of the BGP and Release and concluded that neither vested any ownership interest in Wolfe. It therefore held that, even if Kutsch had fraudulently misrepresented the value of the sale, Wolfe would be unable to show that he was injured—he had no stock rights to relinquish—and summary judgment was in order.

 We agree with the district court. In order to prove actionable fraud, Wolfe must be able to show that Kutsch's conduct caused him some harm. If Wolfe did not own rights to stock in the first instance, Kutsch's representations about the value of the merger, whether fraudulent or not, could not have injured him. There is no fraud in being induced to relinquish something you do not have. *See, e.g.*, *Powers v. Boston Cooper Corp.*, 926 F.2d 109, 111 (1st Cir.1991).[8]

6. Minutes from an October 27, 1993 Board meeting, for example, indicate that the Board discussed employee benefits and specifically considered bonus structures. The Board was particularly concerned about meshing the bonus compensation programs of the newly-merged companies. These minutes, however, do not clearly indicate whether any of the issues discussed were resolved or the specifics of any resolution.

7. Wolfe also claims that he "can sue under a promissory fraud claim." Appellant's Br. at 24. This may be true. In order to preserve the issue for appeal, however, Wolfe must do more than make a passing reference. Wholly

undeveloped arguments are waived on appeal. *See, e.g.*, *United States v. Robinson*, 144 F.3d 104, 107 n. 3 (1st Cir.1998). In any event, the oral promises alleged to support this fraudulent inducement claim suffer from the same defects of imprecision which we have described in connection with the breach of contract claim. *Compare Formosa Plastics Corp. v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41, 48–49 (Tex.1998) (alleged representations sufficiently precise).

8. Section 11(c) of the BGP provides that the BGP "shall be governed by and construed in accordance with the laws of The Commonwealth of Massachusetts." To the extent that

Wolfe forfeited nothing. None of the documents purports to directly vest in Wolfe an ownership interest in the company. Indeed, to the contrary, all of the evidence suggests that Wolfe never owned any stock in Catamount or its successors. Wolfe's original employment contract does not provide for an ownership interest, and the first section of the BGP expressly states that its purpose was to create a financial incentive for participants "*without transferring* to [the participants] ownership of any capital stock of the Company." (emphasis added). Section 2(a) is also unambiguous: "No ownership of any capital stock of the Company will be transferred or otherwise granted to any employee of the Company as a result of the designation or participation of such employee as a Participant."[9]

As before, Wolfe is not discouraged by the clear, written language of documents he signed; he forges ahead, offering numerous reasons why we should ignore this language.[10] Only one such reason merits our attention. Wolfe argues that § 11(d)of the BGP created "tail rights" which endured into 1993 and resulted in his acquiring stock rights. This argument suffers from many flaws. Section 11(d) provided that, if the BGP were terminated prior to the end of a fiscal year and the stock sale compensation provision of § 4(a) were triggered within a year of that termination, then former BGP participants would be entitled to compensation as if the BGP were still active. The BGP, however, was not terminated prior to the end of a fiscal year; rather, it simply expired after only one year on December 31, 1992. Kutsch never renewed the plan; he never designated Participants for fiscal year 1993; and Wolfe (as well as all the other former Participants) never executed an accession agreement for 1993. Moreover, § 4(a) requires that "all of the outstanding Common Stock of the Company [be sold] in a single transaction." It is undisputed that Kutsch sold only 51 percent of his stock in the company. Thus, Wolfe's reliance on § 11(d) is to no avail.

## III.

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment to CVG and Kutsch both on their claims and on Wolfe's counter-claims.

---

resolution of Wolfe's appeal turns on construction of the BGP, we think it appropriate to enforce this provision and apply Massachusetts law. The district court declined to decide "whether Texas or Massachusetts law should apply," because "there is no relevant conflict between Massachusetts and Texas law on either the contract or fraud issues." Mem. and Order (June 10, 1998), at 5 n. 1. Our research confirms that Texas and Massachusetts law do not conflict in any way pertinent to this claim. *Compare, e.g., Powers*, 926 F.2d at 111 (interpreting Massachusetts law) *with Ratner v. Sioux Natural Gas Corp.*, 770 F.2d 512, 519 (5th Cir.1985) (interpreting Texas law).

9. In his deposition, Kutsch repeatedly referred to the BGP as a "phantom stock plan." We believe that this is an apt description. "Phantom" should be understood to apply to

"stock" since the BGP expressly disavowed granting participants any ownership interest. And "phantom" also could be read to modify the plan after its expiration on December 31, 1992.

10. In addition to the clear provisions of the BGP, the Release, which Wolfe signed after consulting at attorney, also leaves little doubt about whether Wolfe ever owned any stock rights in the company. Paragraph 1(e) of the Release states unequivocally that the merger did not trigger any provision of the BGP which might "require any payment to Participants." The Release also made it clear that Wolfe had not been a Participant in the BGP for fiscal year 1993. We do not rely on the terms of this document, however, because Wolfe's fraud claim alleges, in effect, that he was tricked by these very words into signing the Release.