Ronald SMITH, et al., Plaintiffs,

v.

HERITAGE SALMON,
INC., Defendant.

No. 01–CV–46–B–S.

United States District Court,
D. Maine.

Jan. 11, 2002.

Sandra Hylander Collier, Ellsworth, ME, for plaintiffs.

Michael A. Nelson, Jensen, Baird, Gardner & Henry, Portland, ME, for defendant.

## ORDER

SINGAL, District Judge.

Plaintiffs sued their former employer for retaliatory discharge and related acts. Presently before the Court is Defendant's Motion for Summary Judgment (Docket # 6). For the following reasons, the Court GRANTS IN PART and DENIES IN PART the Motion.

### I. SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56(c), summary judgment is appropriate when the record reveals no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). An issue is "genuine" if a reasonable jury, drawing favorable inferences, could resolve it in favor of the non-moving party. *See, e.g., Triangle Trading Co. v. Robroy In-*

*dus., Inc.,* 200 F.3d 1, 2 (1st Cir.1999). It is "material" if its resolution has the potential to affect the outcome of the case under governing law. *See, e.g., Hinchey v. NYNEX Corp.,* 144 F.3d 134, 140 (1st Cir. 1998).

If the non-moving party bears the burden of proof on an issue at trial, as Plaintiffs do on all of their claims in this case, it must adduce facts at the summary judgment stage sufficient to demonstrate a genuine issue of material fact. *See McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 315 (1st Cir.1995). That party may not merely rely on the absence of competent evidence to create an issue. *Id.*

The Court draws facts from pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, *see* Fed.R.Civ.P. 56(c), and views the facts in the light most favorable to the non-moving party. *See, e.g., Parks v. City of Brewer,* 56 F.Supp.2d 89, 92 (D.Me. 1999). Applying this standard, the court recounts the facts below.

## II. BACKGROUND

### A. Introduction

On July 21, 1999, Defendant Heritage Salmon, Inc. ("Heritage") terminated the employment of Plaintiffs Ronald and Corinne Smith. Heritage contends that it did so for work-related reasons. The Smiths, who are husband and wife, believe otherwise. They contend that Heritage fired them because they consistently refused to carry out workplace instructions that they believed to be illegal, and consistently reported environmental violations to their supervisors. The disagreement about the reasons for the Smiths' termination forms the nucleus of this dispute. Other issues, such as the steps Heritage took in terminating them and the emotional trauma resulting therefrom, orbit the periphery.

Ronald and Corinne Smith are residents of East Machias, Maine. Heritage is a Delaware corporation formerly organized under the name "Connors Aquaculture, Inc."[1] Heritage owns and operates several aquaculture facilities in Maine and Canada, where it employs a wide range of salaried, hourly and piece work paid employees. Its relationship with the latter two categories of employees is governed by an employee handbook, known as the "Conditions of Employment."

One of Heritage's facilities is located at Gardner Lake in East Machias. At Gardner Lake, Heritage raises salmon from hatch through the immature, or "smolt," stage, a process takes that several years on average. At least once per year, typically in the spring, the hatchery delivers a crop of smolt to Heritage's saltwater holding facilities, from which the salmon are eventually shipped to customers.

The Smiths both began working at the Gardner Lake hatchery when it opened in 1987. When Heritage purchased the hatchery in 1991, it named Mr. Smith "hatchery manager," which is a salaried position. Mr. Smith was responsible for overseeing the hatchery operation, paying particular attention to the size and health of the fish population, and for supervising the lower-level employees at the hatchery, known as "hatchery technicians." Among other tasks, Mr. Smith collected water quality samples and maintained a running tally of the number of salmon in the population.

This latter task was especially important for Heritage. An accurate count enabled

---

1. For the sake of simplicity, the Court refers to the Defendant only as Heritage, even though during some of the time the Smiths worked for the company it was known by its former name.

the company to reliably predict its levels of production and confidently contract with its customers. To ensure that Heritage's numbers were up-to-date, Mr. Smith sent monthly reports to Robin Muzzerall, his immediate supervisor and Heritage's supervisor of hatchery operations, listing the running tally of salmon smolt at the hatchery. Muzzerall's supervisor was Bill Robertson, Heritage's director of operations.

Mrs. Smith worked alongside her husband at the hatchery. Officially, her title was "hatchery technician," an hourly position, although Mrs. Smith disputes that her title accurately described her job duties. Instead of performing the traditional hatchery technician's tasks of feeding, grading and transferring fish, Mrs. Smith spent most of her time performing clerical work and assisting her husband. For instance, Mrs. Smith prepared hatchery invoices and often took water samples when Mr. Smith could not. She maintained an office in the hatchery building and also contends that she kept a separate office in her home, which Heritage owned and was on the hatchery property. Heritage grants that Mrs. Smith assisted her husband but disputes that she maintained a home office. It also insists that her duties included feeding, grading and transferring fish.

## B. Hatchery Technicians Complain About Mrs. Smith

For several years before Heritage fired the Smiths, other hatchery technicians at the hatchery complained about Mrs. Smith. They claimed that because of her privileged position as the wife of the hatchery manager, she was able to shirk her technician's responsibilities and work less than the required forty-hour week. By the spring of 1999, this perception of Mrs. Smith's work habits had become so acute that the technicians even began keeping a log of Mrs. Smith's comings and goings at the hatchery. Log entries indicated that Mrs. Smith read the newspaper in her office on company time and that she appeared at the hatchery for only a few minutes each day.

Heritage took note of the technicians' complaints and in June 1999 sent its director of industrial relations, Jane Higgins, to investigate. She met with the employees, who repeated their complaints and gave her the log. Higgins reported back to Heritage management about what she had learned from the technicians, and Heritage concluded from that information that Mrs. Smith was inflating her hours. It also concluded that Mr. Smith, as manager and husband, allowed Mrs. Smith to do so.

The Smiths' attendance at an aquaculture convention in late June 1999 bolstered this conclusion. Heritage had informed Mr. Smith that he could attend the convention as a paid employee but had warned Mrs. Smith it would not pay for her attendance. The Smiths nevertheless went to the convention together, and Mrs. Smith billed the company for hours worked while she was there. At the time, the company concluded that this was further evidence of Mrs. Smith padding her time records, although after her firing Mrs. Smith contended that she had worked from her hotel room during the fair. Whatever the case, Heritage did not meet with the Smiths to discuss the inflated-hours issue before it fired them in late July 1999.

## C. The February Freeze

In February 1999, several months before the controversy about Mrs. Smith's hours came to a head, an unpreventable "freeze-up" at the Gardner Lake hatchery caused the loss of roughly 170,000 salmon smolt. In the days following the freeze, Robertson contacted Muzzerall to inquire if the freeze would affect the hatchery's

ability to deliver its targeted number of smolt in the spring. Muzzerall indicated that the hatchery would not meet its targeted levels. Robertson maintains that he also contacted Mr. Smith about the freeze's effects, and that Mr. Smith reiterated Muzzerall's assessment. Mr. Smith denies having such a conversation with Robertson.

Despite the prediction of a shortfall, when the hatchery delivered its stock of smolt to another Heritage facility later that spring, there were, in fact, enough fish to meet Heritage's targeted levels of production. According to Frasier MacLeod, Heritage's director of human relations, in early June 1999 Robertson told him that this production surprise occurred because Mr. Smith had either intentionally undercounted the fish population at the lake and had covered up that fact, or had simply failed to supply adequate information about the size of the fish population at the time of the freeze.

Having a surplus of fish in the spring was not a welcome surprise for Heritage. After the freeze and, according to Heritage, partially based on Mr. Smith's prediction of an impending shortfall in the spring, Heritage entered into long-term contracts to purchase salmon from a competitor hatchery. When it later turned out that the Gardner Lake hatchery had in fact delivered ample fish to meet Heritage's obligations to its customers, the company was left with costly contracts to purchase fish that it did not need.

If Heritage immediately believed Mr. Smith to be at fault for the miscount and subsequent unnecessary open market purchase of salmon, however, it failed to reveal that fact to Mr. Smith at the time. When Mr. Smith delivered his targeted number of salmon that spring, Heritage indicated none of its surprise to him. In fact, until he was terminated nearly three months later, Mr. Smith did not hear any complaints from Heritage about his count and was unaware of Heritage's open market purchase.

D. Environmental Problems at Gardner Lake

During the Smiths' tenure, the Gardner Lake hatchery operated subject to permits issued by the Maine Department of Environmental Protection (DEP) and the United States Environmental Protection Agency (EPA). The permits limited the amount of potentially toxic materials that Heritage could release from the hatchery into a stream flowing out of Gardner Lake. Throughout the 1990's Heritage routinely exceeded the limits set by DEP for the release of a number of the materials (including specifically, phosphorus). The Smiths reported this fact to Heritage whenever their water samples revealed pollutants in excess of DEP regulations. Mr. Smith also discussed his concerns about phosphorus levels with Muzzerall's predecessor, Dr. Brian Glebe. To remedy this condition, Heritage entered into negotiations with DEP to revise its operating limits that resulted in a new permit being issued by DEP sometime in 1999.

The Smiths contend that during the spring of 1999, Muzzerall and Robertson instructed them to perform acts that they believed would have violated EPA and DEP regulations. Both Smiths, for instance, claim that Muzzerall spoke to them individually on separate occasions and directed them to take water samples so as to make the hatchery's effluent appear cleaner than it actually was. They contend that Muzzerall explained that they should do so in order to give the appearance that the hatchery was in compliance with environmental standards, but that they refused because doing so would have been illegal. Mr. Smith also recounts an instance in

which Muzzerall instructed him to use doses of formalin, a diluted form of formaldehyde, in elevated concentrations on the fish population. According to Mr. Smith, he refused because he believed doing so would have violated EPA guidelines.

The Smiths also contend that on several occasions Muzzerall directed Mr. Smith to send strains of fish to Canada that were not authorized to be shipped there under Canadian law. Although Mr. Smith objected to that practice, he complied with the instruction. They also describe a meeting in June 1999, only a month before they were fired, at which Mr. Smith refused an order from Robertson and Muzzerall to increase the population of fish at the hatchery by fifty percent. He explained, according to the Smiths, that he could not do so because the hatchery was already operating in violation of its DEP permit.

Heritage denies that its employees ever instructed the Smiths to perform acts that were illegal.

E. The Termination of the Smiths' Employment

By mid-summer 1999, Heritage management had concluded that the Smiths should be terminated. On July 21, 1999, Robertson, Muzzerall, MacLeod and Higgins arrived at the hatchery and asked to speak with the Smiths in private. Robertson and MacLeod led Mr. Smith into one room, while Muzzerall and Higgins met with Mrs. Smith in an office across the hall. Having sequestered the Smiths from each other, the four simultaneously explained to the Smiths that they were being fired for the fish miscount and Mrs. Smith's inflated hours.

The Smiths claim the Heritage employees acted in an intimidating manner during the meetings. Mrs. Smith, for instance, contends that Higgins "herded" her into the office, made her sit in a corner away from the closed office door, and tried to prevent her from leaving the room. Mr. Smith describes an atmosphere in which he felt intimidated and threatened, and feared that he would be physically restrained if he tried to leave. Heritage disputes these characterizations, noting particularly that Mr. Smith admitted at deposition that he remained in his meeting out of respect for Robertson and MacLeod.

After receiving the news, Mrs. Smith left the room in which her meeting was taking place and walked across the hall into the room where her husband, Robertson and MacLeod were meeting. After briefly commiserating with Mr. Smith, Mrs. Smith walked outside to get some air and spoke with some co-workers. During this time Higgins urged Mrs. Smith to return to the room, and Mrs. Smith ultimately complied. A fifth Heritage employee, Gordy Johnson, stood in the hallway between the rooms during the meetings. The Smiths characterize Johnson's role as that of a security guard whose job it was to intimidate them, although Mr. Smith also confesses that Mr. Johnson acted "friendly" towards him, and Johnson did not prevent Mrs. Smith's movement between the rooms.

In the moments following the firings, Robertson and MacLeod asked the Smiths to remove their belongings from the hatchery building immediately. According to the Smiths, they also initially indicated that the Smiths were to vacate the house on hatchery property within twenty-four hours, although ultimately they allowed the Smiths to remain for thirty days. The Smiths and an eyewitness also contend that MacLeod threatened that the Smiths would be shot if they attempted to return to the hatchery property, although MacLeod denies making that statement. Finally, the Smiths allege that in the weeks that followed, Heritage posted a watchman

outside of their house. Heritage denies doing so.

## F. The Lawsuit

On March 5, 2001, the Smiths filed the instant lawsuit alleging violation of the Maine Whistleblower's Protection Act, 26 M.R.S.A. § 831 et seq. (Count 1); wrongful discharge (Count 2); breach of their employment contract (Count 3); false imprisonment (Count 4); workplace defamation (Count 5); intentional infliction of emotional distress (Count 6); and punitive damages (Count 7). After substantial discovery, Heritage filed a motion for summary judgment.

## III. DISCUSSION

Defendant argues that Plaintiffs have failed to demonstrate genuine issues of material fact as to any of the seven counts of the complaint. The Court addresses each argument below.

## A. Maine Whistleblower's Protection Act

■ Plaintiffs allege that by firing them, Defendant violated the Maine Whistleblower's Protection Act, 26 M.R.S.A. § 831 et seq. ("MWPA" or the "Act"). The reasons Defendant gave for firing them, Plaintiffs claim, were merely a pretext for its true reason: to punish Plaintiffs (1) for refusing to obey instructions that they believed to be illegal and telling Defendant as much; and (2) for reporting ongoing environmental violations at the hatchery. In assessing Plaintiffs claims, the Court employs the familiar *McDonnell–Douglas* burden-shifting scheme to "allocate and order the parties' evidentiary burdens." *Green v. Maine Sch. Admin. Dist. # 77*, 52 F.Supp.2d 98, 109 (D.Me. 1999) (citing *Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 535 (1st Cir.1996)). A plaintiff must first state a prima facie case for violation of the statute. Under the MWPA, a plaintiff states a prima facie case if he shows (1) that he engaged in an activity protected under the Act; (2) that he suffered adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse action. *Id.*

■ Once the plaintiff has stated a prima facie case, the evidentiary burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for taking the adverse action against the plaintiff. *Id.* If it does so, the burden returns to the plaintiff to demonstrate that the defendant's non-retaliatory reasons were pretext and that the true reason defendant took the adverse action was retaliatory. *Id.; See also Dominguez–Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 430 n. 5 (1st Cir.2000) (quoting *Thomas v. Sears, Roebuck & Co.*, 144 F.3d 31, 33 (1st Cir.1998)). Applying this scheme, the Court addresses both of Plaintiff's theories below.

### 1. Refusal to Perform Acts Believed to be Illegal

Plaintiffs first argue that Defendant fired them for refusing to obey orders from Defendant that Plaintiffs believed to be illegal, and for informing Defendant of that fact. Defendant responds that the activity Plaintiffs describe is not a protected activity under the Act, and therefore that Plaintiffs have failed to meet their burden of establishing a prima facie violation. The MWPA prohibits an employer from taking adverse employment action against an employee who, in relevant part, either: (1) reports what he reasonably believes to be an illegal activity at the workplace to his employer or a public entity; (2) reports what he reasonably believes to be a workplace activity that could endanger his own or others' health and safety to his employer or a public entity; or (3) refuses to obey a directive from his em-

ployer that he reasonably believes will place him or others in danger of serious injury or death. 26 M.R.S.A. § 833.

Remarkably *absent* from the MWPA is protection for an employee who is fired merely because he refuses to obey a directive he reasonably believes to be illegal. The Maine Law Court addressed the absence of such a protection in *Devoid v. Clair Buick Cadillac, Inc.*, 669 A.2d 749 (Me.1996). In *Devoid,* a plaintiff sued his former employer under the MWPA after the employer discharged him for refusing to follow instructions he believed to be illegal. *Id.* at 750. In rejecting the lawsuit, the Law Court explained that the MWPA did not protect persons in the plaintiff's situation, even though the plaintiff had explicitly informed his employer that he thought carrying out the instruction would violate the law. *Id.* In effect, according to the Law Court, an employee who refuses to obey an order from his employer because he believes it to be illegal, and who tells his employer as much, is not deemed to have reported the illegality. Rather, he has merely refused to perform a workplace directive, and cannot invoke the protection of the Act unless he has been ordered to do something he reasonably believes will subject him or others to serious injury or death. *Id.* at 751 (Lipez, J. dissenting). The Law Court acknowledged that this interpretation of the Act left the plaintiff in that case with no legal remedy, but called that deficiency a "matter of legislative concern." *Id.* at 750.

■ This is a diversity case, and the Court must apply the MWPA as the Law Court has interpreted it. *See, e.g., Catex Vitol Gas, Inc. v. Wolfe,* 178 F.3d 572, 576–77 (1st Cir.1999) (federal court sitting in diversity must apply state rules of decision). Plaintiffs' case is indistinguishable from the plaintiff's in *Devoid.* They, too, have alleged that their employer instruct-

ed them to violate the law, that they refused, and that they explained their reasons for refusing. Moreover, although Plaintiffs contend that carrying out Muzzerall and Robertson's orders would have created a danger to the stream into which hatchery effluent flowed, they do not allege, and the record does not suggest, that the heightened pollutant levels would have posed a risk of serious injury or death to Plaintiffs or others. Therefore, Plaintiffs have failed to make a prima facie case under the Act because the acts they engaged in were not a protected activity.

2. Reporting of Ongoing Environmental Violations

■ Plaintiffs also allege that Defendant discharged them because they consistently reported to their superiors their concerns about ongoing environmental violations at the hatchery. The Court is satisfied that there exists a genuine issue of material fact as to whether Plaintiffs have stated a prima facie case for retaliatory discharge on this theory. Defendant admits that Plaintiffs informed Heritage of ongoing environmental violations, a protected activity pursuant to 26 M.R.S.A. § 833(1)(A). No one contests that Defendant fired Plaintiffs. The parties disagree as to whether there is a causal connection between the firing and the reports, but the Court finds that a reasonable jury could conclude that Defendant fired Plaintiffs for constantly reporting violations during the time it was negotiating new limits with DEP.

The burden therefore shifts to Defendant to articulate a legitimate, non-retaliatory reason for firing Plaintiffs. It has named two: (1) Mr. Smith's miscount of the fish population; and (2) Mrs. Smith's inflation of her hours, both generally at the hatchery and specifically during the trip to the aquaculture convention, coupled with

Mr. Smith's complicity in allowing her to do so. Plaintiffs do not contest that these are the reasons Defendant gave for firing them.

Thus the burden shifts back to Plaintiffs to demonstrate that Defendant's proffered reasons were merely pretext disguising his real reason for firing them: retaliatory animus. The Court notes that although one of the reasons defendant offered for the terminations applies only to Mr. Smith, the other applies to both of them. This latter accusation, that the Smiths inflated Mrs. Smith's hours, breaks into two subparts. First is the charge that Mrs. Smith shirked her daily duties at the hatchery, rarely working a forty-hour week, and that Mr. Smith allowed her to do so. The second is that Mrs. Smith recorded hours worked during the aquaculture convention against Defendant's specific admonition not to, and that Mr. Smith allowed her to do so. If Plaintiffs fail to demonstrate a genuine issue of material fact as to the pretextual nature either of these sub-parts, they cannot prevail on their MWPA claim, because they will not have shown Defendant was motivated solely by a desire to retaliate against them.

█ The Court finds that Plaintiffs have not demonstrated a genuine issue of material fact as to the latter sub-part. In response to Defendant's explanation, they assert on the record that Mrs. Smith worked from a hotel room during the convention instead of physically attending it. However, the issue in assessing pretext in a *McDonnell–Douglas* burden-shifting case is not whether the reason for firing Plaintiffs was real, but rather whether Defendant *believed* it was real. *See, e.g., Feliciano de la Cruz v. El Conquistador Resort and Country Club*, 218 F.3d 1, 7 (1st Cir.2000); *Mulero–Rodriguez v.*

*Ponte, Inc.*, 98 F.3d 670, 674 (1st Cir.1996). Plaintiffs point to no evidence tending to show that any of Defendant's employees did not believe that Mrs. Smith had inflated her hours during the aquaculture convention. In fact, both parties agree that Defendant remained in the dark as to Plaintiffs' explanation for Mrs. Smith's hours by failing to discuss its concerns with Plaintiffs before firing them. Without any evidence that Defendant doubted its reason, no rational jury could find that this reason for firing Plaintiffs was a pretext. Plaintiffs' claim for violation of the MWPA is therefore without merit.

### B. Breach of Contract

█ Plaintiffs also allege that Defendant breached its duty of good faith and fair dealing under its employment contract with Plaintiffs by firing them. Their argument rests on the premise that a contract between Plaintiffs and Defendant existed, a point over which the parties disagree. The general rule in Maine is that employment for an indefinite period of time is terminable at the will of either party. *Barrera v. Town of Brownville*, 139 F.Supp.2d 136, 141 (D.Me.2001). Parties can limit an employer's ability to fire its employees, however, if they clearly state the restriction (in an employee handbook, for instance). *Id.* (citing *Larrabee v. Penobscot Frozen Foods, Inc.*, 486 A.2d 97, 99 (Me.1984)). For example, a handbook that explains that an employer may only fire its employees "for cause" sufficiently limits the employer's rights so as to create an employment contract. *See Bard v. Bath Iron Works, Corp.*, 590 A.2d 152, 155 (Me.1991).

█ Plaintiffs argue that Heritage's "Conditions of Employment" limited Heritage management sufficiently to create a

contract between them and Defendant.[2] In support of their theory, they contend that the "Management Rights" section of the Conditions curtailed Defendant's ability to fire them at will because it allowed management to discharge employees for "legitimate reasons" or "for just cause." However, Plaintiffs' argument fails to consider that language in context. The Management Rights section does not purport to be exhaustive. It explicitly states that "the enumeration of [management's] rights and authority shall not be considered to exclude those not stated in the article," and specifically reserves and retains for management any rights that preexisted the Conditions. (*See* Aff. of R. Smith (Docket # 16, ex. A, B).)

Plaintiffs have offered no argument explaining how the rights "not stated" that preexisted the Conditions did not include the employer's right to fire an employee at will, and the Court does not see one. Although the Management Rights section of the Conditions is awkward in its phrasing (one is tempted to ask, for instance, why Defendant included "for just cause" as a ground for discharge at all), the section as a whole clearly establishes that management does not relinquish any rights by only enumerating some of them. The "Termination" provisions of the Conditions only reinforce this conclusion. That section allows the employer to fire an employee for "conduct," which is defined as "any reason not prohibited by law." *Id.* Such a broad definition belies any suggestion that Defendant intended to limit itself. Simply put, the Conditions of Employment did not limit Defendant's ability to fire its employees. Plaintiffs were at-will employees, and cannot pursue a claim for breach of contract.

C. Wrongful Discharge

■ In addition to their MWPA and breach of contract claims, Plaintiffs make a claim for wrongful discharge. Maine courts consistently have held that an at-will employee cannot pursue such an action. *See, e.g., Staples v. Bangor Hydro–Electric Co.,* 561 A.2d 499, 501 (Me.1989). Indeed, generally Maine does not recognize the tort of wrongful discharge *at all. See, e.g., Bard,* 590 A.2d at 155. However, the Law Court has acknowledged the possibility of a narrow exception to that rule. Wrongful discharge may be a viable cause of action for aggrieved at-will employees if denying them the claim would contravene public policy and recognition of the tort would not make a preexisting statutory remedy redundant. *See Green v. Maine Sch. Admin. Dist. # 77,* 52 F.Supp.2d 98, 110 (D.Me.1999) (citing *Larrabee,* 486 A.2d at 100, and *Bard,* 590 A.2d at 156).

■ Because the Court, sitting in diversity, is bound to interpret state law in accordance with state rules of decision, *see Catex,* 178 F.3d at 576–77, it must divine whether the Law Court would recognize a cause of action for wrongful discharge for Plaintiffs. This inquiry reveals two underlying questions: whether denying Plaintiffs the ability to recover would contravene public policy; and whether the MWPA already governs this area of law, so that allowing Plaintiffs to recover for wrongful discharge would make the statute redundant. *See Green,* 52 F.Supp.2d at 110. The Court assumes, for the sake of argument, that the Law Court would answer the former question affirmatively.

**2.** By their terms, the Conditions only govern Defendant's relationship with "hourly and piece work paid employees." Plaintiffs do not explain why they would ever apply to Mr. Smith, who was a salaried employee. For the sake of argument, however, the Court assumes that they would.

■ Plaintiffs argue that recognizing a wrongful discharge claim in Plaintiffs' case would not make the MWPA redundant because the MWPA does not protect them. While it is true that Plaintiffs have no claim under the MWPA, it would nonetheless be made redundant if the Court were to recognize the wrongful discharge claim Plaintiffs assert, because the Act governs Plaintiffs' predicament in its silence. In enacting the MWPA, the Legislature had the opportunity to create the sort of rule Plaintiffs urge the Court recognize, but failed to do so, despite including causes of action arising from a number of very similar reports of workplace dangers.[3] It also failed to revise the statute after the Law Court exposed and highlighted the deficiency that Plaintiffs seek to remedy. *See Devoid,* 669 A.2d. at 751.

■ To allow Plaintiffs to pursue a claim for wrongful discharge, the Court would have to assume that the Law Court presently is inclined to act in lieu of the Legislature. Because the Law Court did not do so in *Devoid,* and because the Legislature has remained silent on this issue since then, the Court is reluctant to break new ground on the Law Court's behalf. *Cf. Greene v. Union Mut. Life Ins. Co.,* 623 F.Supp. 295, 299 (D.Me.1985) (refusing to find action for wrongful discharge where doing so would tamper with a remedial scheme covering the issue erected by the Legislature). By its silence, the Legislature rejected the argument Plaintiffs advance. There is no cause of action, in Maine, for the wrongful discharge of an employee fired merely for refusing to obey a workplace instruction because he believes the instruction to be illegal.

**3.** The well-worn maxim inclusio unius est exclusio alterius (to include one thing implies

**D. False Imprisonment**

■ Plaintiffs also contend that Defendant falsely imprisoned them by isolating them during the termination meetings. False imprisonment occurs when an actor, without authority, (1) intends to, and does in fact, confine another (2) within boundaries fixed by the actor, and (3) the victim is conscious of the confinement or is harmed by it. *See McCann v. Wal–Mart Stores, Inc.,* 210 F.3d 51, 53 (1st Cir.2000) (citing Restatement (Second), Torts, § 35 (1965)). Confinement can be effectuated by physical force, explicit or implicit threats of physical force, or even "unspecified means of 'duress.'" *Id.* at 53–54.

■ Defendants object that the record reveals that Plaintiffs were never actually "confined." Although the case is close with regard to Mrs. Smith, the Court agrees. It is undisputed that Defendant segregated Plaintiffs before firing them, and that the doors to the offices where they met were closed. The evidence also demonstrates that Higgins attempted to prevent Mrs. Smith from leaving the office, and from walking around the hatchery. Mrs. Smith describes this behavior as an attempt to "herd" her back into the office where the meeting was taking place.

However, indulging all inferences on Plaintiffs' behalf, a reasonable jury could not find that Mrs. Smith was "confined" to the room. *See Triangle Trading,* 200 F.3d at 2. Although she may no longer have possessed the right to wander about the hatchery property, she nevertheless could have left the property altogether at any time. Plaintiffs point to no evidence that could lead a jury to believe that Mrs. Smith actually believed she had no choice

the exclusion of another) is apposite.

but to return to the room. *See generally,* Restatement (Second) Torts, § 36 (1977).

The case for Mr. Smith is significantly less challenging. Although Mr. Smith claims, in his affidavit, that he felt intimidated by Defendant's actions on the day of the firing and believed Robertson and MacLeod would have physically restrained him from leaving, Plaintiffs point to no objective evidence tending to show that this was, in fact, the case. Moreover, his statement is contradicted by his deposition, in which he admitted that he remained in the room during his firing out of respect for Robertson and MacLeod. *See, e.g., Colantuoni v. Calcagni & Sons,* Inc., 44 F.3d 1, 4–5 (1st Cir.1994) (no genuine issue of material fact created by an affidavit that contradicts sworn testimony). That acknowledgment suggests that Mr. Smith knew he could leave at any time and belies any suggestion that he was in fact confined.

E. Workplace Defamation Claim

Plaintiffs also claim that Defendant defamed them in a variety of ways. First, they allege that all of the statements made by the Heritage employees sent to the hatchery to fire them were defamatory, as were all of the statements those employees presumably made to each other about the reasons for termination. Second, they claim that Higgins defamed Mrs. Smith by discussing the results of her investigation of hatchery employees' complaints about Mrs. Smith with other Heritage employees. Third, they advance a theory of defamation based upon "compelled self-publication" to their pastor. Finally, they claim that Robertson defamed Mr. Smith when he suggested to MacLeod that Mr. Smith had intentionally misled the company as to the fish count and covered it up.

■ Under Maine law, defamation requires (1) the unprivileged publication of a false statement tending to harm the reputation of the person about whom it is spoken; (2) fault amounting at least to negligence on the part of the speaker; and (3) special harm caused by the publication, or a statement that is actionable regardless of special harm. *See Baker v. Charles,* 919 F.Supp. 41, 45 (D.Me.1996) (citing *Lester v. Powers,* 596 A.2d 65, 69 (Me.1991)). Applying this standard, the Court evaluates each of Plaintiffs' claims of defamation separately.

1. General Claim of Defamation Against Defendant

■ Plaintiffs first claim that Defendant is liable for defamation because the four employees who fired them were aware of the reasons for termination, and communicated that information to Plaintiffs and, presumably, to each other. This claim is without merit. To state a prima facie case for defamation, a plaintiff must, at a minimum, establish the three elements of defamation listed above. In this case, to show publication of a false statement Plaintiffs merely rely upon the allegation that the four Heritage employees discussed the reasons for firing them. This fact is not adequate to state a prima facie case of defamation, because it does not allege any particular statement. *See, e.g., Picard v. Brennan,* 307 A.2d 833, 834–35 (Me.1973) (defendant in slander action entitled to know precisely what statement is attributed to him and material words must be strictly proved as alleged).

2. Claim that Higgins Defamed Mrs. Smith

■ The same argument applies to Plaintiffs' claim that Higgins defamed Mrs. Smith by investigating the rumors that Mrs. Smith had inflated her hours and reporting the results of the investigation Heritage. Plaintiffs have not demonstrat-

ed any facts showing what, specifically, Higgins said to her supervisors. *See id.* There is no genuine issue of material fact on this issue.

### 3. Compelled Self–Publication

 Plaintiffs also claim that they have been compelled to reveal the reasons for their firing to their pastor when they sought counseling for the emotional effects of the firing. That, they contend, satisfies the publication element of the defamation claim and entitles them to recover. Maine recognizes compelled self-publication to a subsequent employer in a job interview as a means of publication in a defamation case. *See Carey v. Mt. Desert Island Hosp.*, 910 F.Supp. 7, 11–13 (D.Me.1995) (deciding the Law Court would likely recognize this theory under prevailing case law). Yet, the *Carey* court emphasized that the bar to proving compulsion in this context must be set high to avoid "potential abuses" of the doctrine. *Id.* at 13. In particular, it noted that "[r]epetition of defamatory statements to friends or family would not likely meet the compulsion standard." *Id.* at 12 n. 3. The Court interprets that warning to refer generally to persons in whom a victim of a defamatory statement might freely seek solace, and cannot conclude that self-publication to one's pastor for the purposes of counseling fits within the narrow confines of *Carey.*

Plaintiffs insist that it should, because Defendant could reasonably have expected them to seek counseling given the manner by which they were terminated. Yet, the Court is hesitant to ascribe that sort of open-ended reasonable expectation to a putative defamer. The potential for abuse of the doctrine, as the *Carey* court warned, is high. Were the Court to enforce a reasonable expectation that a person would seek counseling for the effects of statements made about them, the compelled self-publi-

cation rule could defeat any ability for employers to confidentially communicate with their employees without fear of suit. The rule cannot extend that broadly.

Moreover, even if such a rule were in effect, Plaintiffs admit that they sought counseling because of the traumatic nature of the termination meetings, and not specifically because of the reasons Defendant gave for firing them. If that is the case, there is no genuine issue of material fact as to whether the Plaintiffs were compelled to reveal the reasons they were fired to their pastor. For that reason, too, their claim must fail.

### 4. Claim that Robertson Defamed Mr. Smith

 Finally, Plaintiffs claim that Robertson, in a conversation with MacLeod, defamed Mr. Smith by suggesting that Mr. Smith had intentionally misled the company by undercounting his fish and then trying to cover up that fact. This allegation states a prima facie claim, in that Plaintiffs allege it is false and that it tended to harm Mr. Smith's reputation. Plaintiffs need not show special damages in this case because the statement concerns Mr. Smith's profession, and is therefore per-se slanderous. *See, e.g., Gautschi v. Maisel,* 565 A.2d 1009, 1011 (Me.1989) (statements that impugn one's profession or occupation are slander per se).

 Defendant objects, however, that any statements Robertson made about the reasons for terminating Mr. Smith were made to persons within the company, and were therefore privileged. The Court agrees. *See Hawley v. Atlantic Cellular Telephone Corp.,* Docket No. 93–CV–362–P–H, 1994 WL 505029 (D.Me. Sept.2, 1994) (holding that the disclosure of the reasons for terminating an employee to "individuals within normal channels for employee discipline" is privileged). Even if the

speaker makes a statement that is privileged, however, a plaintiff may nonetheless maintain an action for defamation if he can demonstrate that the speaker knew his statement to be false, recklessly disregarded its truth or falsity, or acted out of ill will towards the plaintiff. *See Staples v. Bangor Hydro–Elec. Co.*, 629 A.2d 601, 604 (Me.1993) (citing Restatement (Second), Torts, § 596 (1977)). To show recklessness, a plaintiff must demonstrate that the speaker "entertained a high degree of awareness of probable falsity or serious doubt as to the truth" of the statement. *Id.* at 604.

To survive summary judgment, therefore, Plaintiffs must also adduce facts tending to show that Robertson knew his statement was false, or recklessly disregarded the truth or falsity of his statement.[4] To meet that burden, Plaintiffs claim (1) that Mr. Smith did, in fact, keep an accurate count of the fish, (2) that Mr. Smith regularly and accurately reported the number of fish in the population to Muzzerall, Robertson's underling, and (3) that until the day he was fired he had not received any complaints about his fish count. Taken together, the Court is satisfied that these allegations create a genuine issue of fact as to whether Robertson believed his statement. A reasonable jury could determine, on this evidence, that Robertson knew or recklessly disregarded the fact that Mr. Smith kept an accurate count of the fish at the hatchery, and therefore that Robertson had defamed Mr. Smith. This is the *only* theory by which Plaintiffs have stated a genuine issue of material fact as to defamation.[5]

**F. Intentional Infliction of Emotional Distress**

To make a prima facie showing of intentional infliction of emotional distress, a plaintiff must demonstrate that

(1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from his conduct; (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, and utterly intolerable in a civilized community; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Hinkley v. Baker*, 122 F.Supp.2d 57, 60 (D.Me.2000) (citing *Vicnire v. Ford Motor Credit Co.*, 401 A.2d 148, 154 (Me.1979)). Indulging all reasonable inferences on Plaintiffs' behalf, at worst, Plaintiffs have stated facts tending to show that Defendant fired them in a callous, awkward and intimidating manner. There is nevertheless insufficient evidence in the record on which a jury could find that Defendant's conduct was so extreme or outrageous as to justify recovery for intentional infliction of emotional distress.

**G. Punitive Damages**

Punitive damages require a showing of malice, either express or implied. *See, e.g., Tuttle v. Raymond*, 494 A.2d 1353, 1361 (Me.1985). Implied malice

---

**4.** Plaintiffs do not contend that any of Defendant's employees harbored ill will towards them.

**5.** The Court notes that Mr. Smith faces a difficult task in proving damages in this case. To recover lost wages, he will have to adduce facts showing that but for the defamation, he would not have lost his job. On the record before the Court, it does not appear he will be able to do so. Nor does it appear, based upon the record, that he will be able to demonstrate damage to his professional reputation.

is behavior that, while not motivated by ill will, is "so outrageous that malice toward a person injured as a result of that conduct can be implied." *Id.* Even assuming that Plaintiffs prevail on their only remaining claim for defamation by Robertson against Mr. Smith, Robertson's statement is not so outrageous as to imply malice.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's summary judgment motions as to Counts One, Two, Three, Four, Six and Seven of Plaintiffs' Complaint. It GRANTS IN PART and DENIES IN PART Defendant's motion as to Count Five, leaving intact only Plaintiffs' claim that Robertson defamed Mr. Smith.

SO ORDERED.