STATE OF MAINE                                    SUPERIOR COURT
PENOBSCOT, ss.                                    DKT. NO. CV-18-167


DANIEL ALBERT,                          )
                                        )
        Plaintiff,                      )
                                        )
v.                                      )        **JUDGMENT**
                                        )
SCOTT NASON                             )
                                        )
        Defendant.                      )


This matter came before the Court on April 13 and 14, 2022 for a jury-waived trial. Plaintiff Albert appeared and was represented by Attorney N. Laurence Willey. Defendant Nason appeared and was represented by Attorneys Jon Liberman and Gregory Patient. At the request of both parties, the record remained open until July 13, 2022 for the parties to present evidence on the amount Medicare paid to satisfy the medical expenses incurred by the Plaintiff as a result of the incident in question. On July 13, 2022, the parties filed their Stipulation regarding the amount paid by Medicare. This matter is now in order for decision.

The Court finds the following facts based on the evidence presented:

On June 4, 2018, Plaintiff was operating his motor vehicle on the Kelley Road exit ramp of I-95 in Orono, ME. He was heading to a National Eagle Scouts Association (NESA) meeting, which was to be held at the Boy Scouts building located almost across Kelley Road from the exit ramp. To reach the Boy Scouts building, Plaintiff needed to take a right turn at the end of the exit ramp and then a quick left turn into the driveway of the building. Plaintiff had driven this route innumerable times in the past without incident.

At the same time as Plaintiff, Defendant was also operating his motor vehicle on the Kelley Road exit ramp of I-95 in Orono, ME. He was proceeding to his home on the Kelley Road, which

1

was a very short distance from the exit ramp. To reach his home, Defendant needed to take a left turn at the end of the exit ramp. Like Plaintiff, he had driven this route innumerable times in the past without incident.

The exit ramp in question is a single lane up until the end of the ramp near the Kelley Road where it opens into a space such that two cars can be at the end of the exit ramp, side-by-side. Frequently, two cars will be at the end of the exit ramp when one car is turning right and the other is turning left.

On the day in question, the Plaintiff was ahead of the Defendant on the exit ramp and had his right directional signal blinking. Defendant came up behind the Plaintiff near the Kelley Rd. end of the ramp and began to attempt to move to the Plaintiff's left. The parties presented contrasting narratives on what occurred when the two cars approached the end of the exit ramp. The Court is satisfied that while making his right-hand turn Plaintiff's car drifted or swung somewhat to the left such that Plaintiff's vehicle veered into the space Defendant needed to execute his left-hand turn. Plaintiff's movement to the left caused Defendant to take evasive action to avoid a collision with Plaintiff's vehicle. While taking this evasive action, the Court is satisfied that the front tire of Defendant's vehicle suffered some damage by coming in contact with the nearby guardrail. The Court is also satisfied that Plaintiff was unaware that his driving caused Defendant's evasive action. After the evasive action, Defendant shouted and gestured at the Plaintiff, and Plaintiff heard and observed the Defendant. The parties then both made their respective turns from the end of the exit ramp.

Plaintiff turned right at the end of the exit ramp and took the quick left into the driveway of the Boy Scouts building. He then proceeded around the back of the building into the parking lot and parked his vehicle. As the Plaintiff was doing that, Defendant turned left off the exit ramp and

2

stopped a very short distance away to check for damage to his vehicle. He heard hissing from his driver-side front tire, saw the white lettering on his tire was scuffed, and saw a nick on the rim of his wheel. He then immediately drove to the Boy Scouts parking lot and located the Plaintiff.

After Plaintiff exited his vehicle, he observed the Defendant in the parking lot. The Defendant was outside of his vehicle and was yelling obscenities, stating something to the effect of the Plaintiff having cut him off or running him off the road, and pointing to his hissing tire. What happened next occurred very quickly and is the crux of the case.

When Defendant went to the Boy Scouts parking lot to confront the Plaintiff, he was very angry. He was fuming that the Plaintiff had made a driving maneuver that required he take evasive action. He was fuming because he believed that his vehicle had suffered damage. He was fuming because he perceived that the Plaintiff had been gesturing and swearing at him. Additionally, Defendant was late to give his very ill dog her necessary medication.

Defendant testified that when he confronted the Plaintiff, Plaintiff pointed at the Defendant and put his (Plaintiff's) finger into the Defendant's mouth and touched his teeth. Defendant testified that in response he made a fast, forceful upward motion with his arm and closed fist in an attempt to knock the Plaintiff's finger away. He asserted that when he hit Plaintiff's finger away, he hit Plaintiff's face at the same time. Defendant testified that his contact was an accident and was unintentional. For his part, the Plaintiff recalls seeing the Defendant in the Boy Scouts parking lot and hearing the Defendant swearing and saying you F—cut me off, or something to that effect. The next thing Plaintiff remembers is he was sitting in the seat of his car with ambulance personnel nearby. Plaintiff did not see Defendant's fist coming at him. The one purported non-party

3

eyewitness to the incident, Tom Turlo, unfortunately passed away before trial.[1]

While Plaintiff *may* have pointed at the Defendant, the Court does not accept that Plaintiff put his finger in Defendant's mouth or otherwise touched the Defendant. Defendant spoke to the police very shortly after this incident and during that interaction he never mentioned that Plaintiff touched him or took any physical action toward him. Rather, Mr. Nason told the police officer that Plaintiff had driven him into a guardrail (or words to that effect), that he (Nason) had punched Plaintiff right in the f – ing face, that he had taught Plaintiff a lesson, and that he punched the Plaintiff right in the f-ing face and that was his confession.

After the Defendant hit the Plaintiff, Plaintiff fell to the ground. The pool of blood on and near the driver-side front of the Plaintiff's vehicle was substantial. Plaintiff was unconscious for a period of time and others attending the Boy Scouts meeting helped sit Plaintiff back in his vehicle. Police were called and an ambulance arrived. Plaintiff refused ambulance transport to the hospital but asked to be taken to the EMMC Emergency Room by Rod Charette, an off-duty State Trooper.

After the altercation, Defendant left the parking lot at a high rate of speed before the police arrived and hid his vehicle behind his house. When the police arrived at the Defendant's house to ask him about the incident with the Plaintiff, Defendant initially told the police that his vehicle was at a repair shop. However, the police eventually observed that Defendant's vehicle was actually behind the Defendant's house.

ANALYSIS

There are nine counts in Plaintiff's Amended Complaint filed on May 10, 2019. With

---

[1] Both parties made much of statements made by Mr. Turlo. The Court places little weight on these statements as they are ambiguous, it is unknown what vantage point Mr. Turlo had for his observations, and it is not known how much of the incident he observed as opposed to what he may have assumed and concluded.

4

consent, Plaintiff withdrew counts II and III. Plaintiff did not pursue Count VII (Uninsured Motorist Insurance Coverages), Count VIII (Unfair Claims Settlement Act), and Count IX (Unfair Trade Practices), and those counts will be dismissed. The remaining counts, Count I (Assault and Battery), Count IV (Maine Civil Rights Act), Count V (Negligence), and Count VI (Defamation) will be analyzed separately.

## 1. **Assault and Battery**

"The central element of battery, the essence if you will, is a physical touching." Simmons, Zillman & Furbish, *Maine Tort Law*, § 1.01 at 1-2 (2018 ed.). Under Maine's common law of torts, a defendant is liable for "assault and battery"[2] if the defendant, without permission or privilege, unlawfully touches the person of another "with the intention of bringing about a harmful or offensive contact." *Wilson v. State*, 268 A.2d 484, 486-87 (Me. 1970); RESTATEMENT (SECOND OF TORTS) §§ 13, 18 (1965); see also Parker v. Dall-Leighton, No. 2:17-cv-0216-GZS, 2018 U.D. Dist. LEXIS 163856, at *7 (D Me. Sep. 25, 2018) (holding that a defendant was liable for "assault and battery" under Maine law); *Bucci v Essex Ins. Co.*, 393 F.3d 285, 297 (1st Cir. 2005) (holding that a district court applied the correct legal standard for "assault and battery" under Maine law).

A defendant acts "with the intention of bringing about a harmful or offensive contact" if he or she acts for the purpose of bringing about the harmful or offensive contact or acts with substantial certainty that the consequences of his or her actions will bring about the harmful or offensive contact. See *Pattershall v. Jenness*, 485 A.2d 980, 984 (Me. 1984); RESTATEMENT

---

[2] In many jurisdictions, "assault" and "battery" are regarded as separate intentional torts where "assault" refers to the tort of placing another in imminent apprehension of harmful or offensive contact and where "battery" refers to the tort of causing actual harmful or offensive contact to another. Maine's Law Court uses the term "assault and battery idiomatically to refer to a consummated battery." *Maine Tort Law* § 13.27 at 1-8 to -9 (2018 ed.).

5

(SECOND OF TORTS) §§ 8A, 18 cmt e. The defendant's intent can "be inferred from the result of the attack." *Bucci*, 393 F.3d at 297 (applying Maine law); *Mut. Fire Ins. Co. v. Hancock*, 634 A.2d 1312, 1313 (Me. 1993) ("Absent a rare admission by the party, a party's intent can only be inferred from his physical acts."). The Plaintiff need not show that the defendant acted with 'malice' or 'bad intent' to hold the defendant liable for the tort of assault and battery. *Prentiss v. Shaw*, 56 Me. 427, 441 (1869) ("It is not the motive, or the feelings under which the legal wrong is committed, which determines the character of the act. … It cannot be excused, if legally unjustified, by proof of sudden passion, or the absence of malice or wrong intent). RESTATEMENT (SECOND OF TORTS) § 13 cmt c ("If an act is done with the intention described in this Section, it is immaterial that the actor is not inspired by any personal hostility to the other, or a desire to injure him.").

As noted above, when the Defendant entered the Boy Scouts parking lot he was very angry. When Plaintiff and Defendant were close together in the parking lot outside of their vehicles, Defendant punched the Plaintiff. At trial, Defendant demonstrated this as a swing with his closed fist in a fast upward and forceful manner which made contact with the Plaintiff's face. When speaking with the police officer shortly after the altercation, Defendant stated that he punched the Plaintiff right in the f--- face. At trial, Defendant testified that he acted in response to Plaintiff putting his (Plaintiff's) finger in his (Defendant's) mouth, and that his action was to move the Plaintiff's finger away.[3] Defendant also testified that he hit Plaintiff "on reflection."[4] It was

---

[3] Defendant testified that Plaintiff's finger was touching the Defendant's teeth. The Court does not accept that Plaintiff's finger or any other part of the Plaintiff's person was touching the Defendant in any manner. The Court is satisfied that the Plaintiff walked in the direction of the Defendant to enter the Boy Scouts building, that Plaintiff was going to say something to the Defendant on Plaintiff's way into the building, and Plaintiff might have pointed at the Defendant.

[4] To the extent the term "on reflection" was intended to suggest a reflex, the Court does not accept that Defendant's upward, fast and forceful swing with a closed fist was a "reflex." The Court is also not satisfied that Defendant's upward, fast and forceful swing with a closed fist was reasonable to "deflect" Plaintiff's hand. The Court also does

6

suggested that Defendant should not be held liable for assault and battery because he did not intend to cause Plaintiff's injuries. However, the test is not whether the Defendant intended to cause physical injury to Plaintiff, but rather whether he unlawfully touched the Plaintiff "with the intention of bringing about a harmful or offensive contact."[5] *Wilson v. State*, 268 A.2d 484, 486-87 (Me. 1970); RESTATEMENT (SECOND OF TORTS) §§ 13, 18 (1965). Even if Defendant did not intend to directly strike the Plaintiff's nose, Defendant's act of quickly swinging his closed fist in an upward and forceful fashion in close proximity to the Plaintiff made it "so highly likely that bodily injury would result that the act is deemed intended or expected." See *Landry v Leonard*, 1998 ME 241, ¶ ¶ 9-15, 720 A2d. 907 (1998), (holding that a defendant's knowledge that a knife would be used as a threat in a robbery made it "so highly likely that bodily injury will result that we deem willing participation in the crime to have the intent or expectation to cause the bodily injury" and therefore was an "intentional act" that precluded a finding of negligence.) Moreover, Defendant's statements to the police office after the incident strongly indicate that he acted "with the intention of bringing about a harmful or offensive contact" with the Plaintiff. In particular, Defendant told the police that: 1) he (the defendant) had 'taught the Plaintiff a lesson;' and 2) he had 'punched Plaintiff right in the f—face and that's my confession." He also said something to the effect of "if someone had cut the officer off he'd punch them in the f—face and that he had had enough of f – heads." While the Defendant may not have intended to cause the particular injuries that occurred in this case, the Court is well satisfied that Defendant punched the Plaintiff and engaged in deliberate conduct that had a substantial certainty to cause harmful or offensive contact to the Plaintiff.

---

not accept that the Defendant's conduct was accidental and unintentional as Defendant swung his fist in an upward and forceful manner.

[5] Defendant testified that he "never intended to hurt Plaintiff in *the way he was hurt.*"

Based on all of this evidence, the Court finds that the Defendant hit the Plaintiff with the intent to bring about harmful or offensive contact (a battery) or that such harm is deemed intended or expected. The motion and amount of force used by the Defendant not only caused "harmful or offensive contact," it in fact caused serious harm to the Plaintiff. The Court finds the Defendant committed the tort of assault and battery.

*Damages*

The next issue is the damages to be awarded to the Plaintiff due to the Defendant's conduct in the parking lot.

i.     Compensatory Damages

After being transported to the emergency room immediately after the incident, Plaintiff was diagnosed with fractures to his nasal bones. He had a CT scan of his head and it was read as "no acute intracranial process." After many hours in the ER, Plaintiff was released and Mr. Charette drove Plaintiff to Plaintiff's home in Hermon.

The next day, Plaintiff retrieved his car and drove to Matagamon.[6] His face was very significantly bruised. A few days later, Plaintiff and his wife returned to their home in Hermon because Plaintiff was not feeling well.

Plaintiff had a rough medical course throughout the summer of 2018. While the nose fractures healed well without medical care, his head injury and blood clotting issues did not. Plaintiff's right leg began to swell, and on June 13, 2018, Plaintiff saw his PCP for treatment. On June 14, 2018, he underwent an ultrasound of his right leg and was diagnosed with extensive deep

---

[6] In June of 2018, Plaintiff and his wife had a camper stationed at Matagamon Lake in Maine. When Plaintiff left to return to the Bangor area on June 4, 2018, Plaintiff's wife remained behind. Plaintiff left to retrieve mail from their home in Hermon, run some errands, and then attend the Boy Scouts meeting.

8

vein thrombosis (DVT) with an elongated nonocclusive clot turning occlusive lower in the leg. Plaintiff began taking a blood thinner, Lovenox. Lovanox was administered by injection twice per day into the Plaintiff's stomach.

On June 18, 2018, Plaintiff had a repeat brain CT scan which showed a "new approximately 6 mm left and trace right cerebral convexity subdural hygromas." Plaintiff continued taking Lovenox. On June 21, 2018, Plaintiff had a brain MRI and was diagnosed with a subdural hygroma. The clear blood products were resolving and there was nothing to suggest acute bleeding at that point. He remained taking Lovenox. A few days later, he began taking Coumadin, along with the Lovenox. Shortly thereafter, he experienced a severe headache. On June 28, 2018, Plaintiff had a head CT scan which showed a seemingly worsening acute on chronic subdural hematoma with progressive mass effect. He reported to the emergency room complaining of headaches. He was then admitted to EMMC for a neurosurgical consult. Plaintiff's physicians stopped the Lovenox and Coumadin and administered dexamethasone to decrease the cerebral edema. Because of the subdural hematoma, full anticoagulation treatment could not be administered to address the DVT so an inferior vena cava filter was surgically placed in Plaintiff's body to catch blood clots from the Plaintiff's legs before they reached his lungs. This filter is permanent. On July 2, 2018, Plaintiff had a follow-up CT brain scan which showed a "stable left cerebral convexity evolving subdural hematoma with stable mass effect and rightward midline shift." He was discharged home on July 2, 2018 with medications.

On July 17, 2018, Plaintiff was seen in follow-up by a neurologist and he had a repeat CT brain scan. The CT scan showed that the left cerebral convexity was stable. During the neurology follow-up, the Plaintiff was told that he was "likely suffering symptoms related to multiple factors including concussion and steroid side effects as well as perhaps anxiety and depression symptoms

9

just from the situation itself." The steroids were discontinued.

On July 27, 2018, Plaintiff was seen at his PCP's office complaining of fatigue and lack of interest in doing anything. He had been taking Paxil for about ten days by this time. He was diagnosed with PTSD and "reactive depression," and was referred for counseling.

On July 31, 2018, Plaintiff was seen for breathing problems. Neither a pulmonary embolism nor pneumonia could be ruled out, and he was admitted to the hospital once again. On August 2, 2018, while working with in-patient PT, he became short of breath. A CT scan was performed and massive bilateral pulmonary emboli were discovered. Due to his subdural hematoma, he was not a candidate for thrombolytics. On August 3, 2018, he was given Last-Rites and was Life-Flighted to Maine Medical Center (MMC) in Portland for possible surgery. At MMC, the "active hospital problems" were: acute massive pulmonary embolism, history of subdural hematoma, acute deep vein thrombosis of the femoral vein of the right lower extremity, and anxiety. After supportive therapies, administration of medications, and careful monitoring, he was discharged home on August 10, 2018. He received in-home care for approximately a month.

On September 25, 2018, Plaintiff had a CTA which showed the pulmonary emboli were nearly resolved and no evidence of pneumonia, but he was experiencing a persistent filling defect issue in the left lower lobe.

By September 27, 2018, Plaintiff was proceeding toward recovery. He denied that he had any headaches or shortness of breath and reported that he was getting back to his regular activities. However, in November of 2018, he reported to his health care provider that he had a lack of ambition and a lack of interest in activities and his Paxil was increased.

By February 6, 2019, his strength had returned and he reported that he was almost back to baseline. He was active at the time. However, on May 6, 2019, Plaintiff had intermittent leg

10

swelling; another ultrasound was ordered and his physician recommended that he wear compression stockings. He was no longer taking Paxil and he reported doing well. By July 9, 2019, he was doing well, but for some tiredness. Thereafter, Plaintiff continued to attend medical appointments to follow-up on the DVT and pulmonary issues.

The Court finds that all of this medical care is causally related to Defendant hitting the Plaintiff on June 4, 2018.

Since late August/early September of 2018, Plaintiff has taken Eliquis to reduce the risk of blood clot complications and he will need to remain on this or similar medication for the rest of his life. He also has been taking Decloxizine, but it is unclear whether this medication will be needed for the remainder of his life and he was prescribed the medication primarily to addresses other issues.

Plaintiff seems stoic with respect to pain and suffering. From his dire circumstances in August of 2018, Plaintiff has made a remarkable recovery. However, he now has a permanent filter implanted, he is at increased risk of serious consequences if he suffers another head injury, and he is at increased risk for problems related to blood clots.

Plaintiff understandably had a significant amount of anxiety related to his medical situation. Before June 4, 2018, Plaintiff had intermittent anxiety for which he received medication, particularly around the time of his prostate surgery. His anxiety waxes and wanes. Based on the record, the Court is satisfied that after the acute phase of his medical recovery resulting from the Defendant's conduct passed, Plaintiff continued to have some anxiety. Since then and going forward, the court is satisfied that the most significant reason for his anxiety was and will be related to a preexisting underlying anxiety condition. However, the Court finds that Plaintiff has some residual anxiety related to Defendant's conduct, which contributes in some small way to his overall

11

condition.[7]

Before the June 4, 2018 incident, Plaintiff was quite active with his volunteer work for the Boy Scouts, cutting wood for his home, doing mechanical work, being a ham operator, and hunting. After being struck by the Defendant, Plaintiff could not engage in these activities in any meaningful way in the summer of 2018 and for sometime thereafter. By February 9, 2019, Plaintiff was almost back to his baseline. Plaintiff now has some back issues that are not related to the June 4, 2018 incident that limit his physical activities. The June 4, 2018 incident has also affected Plaintiff's relationship with his wife.

Plaintiff's medical providers billed $152,645.11 for Plaintiff's medical care, and those expenses were paid in full by Medicare for $63,993.68. Approximately $1,084. of the $152, 645.11 relates to Pouzol PT. It appears to the Court that the Pouzol PT relates to stenosis and does not relate to the June 2018 event.

As of 2018, Plaintiff had a life expectancy of 11.9 years.

Plaintiff sustained serious injury as a result of being hit by the Defendant and his extensive injuries required the medical treatment set forth above. During the months following the incident, he was hospitalized twice and at one time his condition was so severe that he was given his Last Rites before being life-flighted to Portland from Bangor. The Plaintiff began taking Eloquis on August 30, 2018 and he will require this medication for the rest of his life. Eloquis costs Plaintiff about $1400. per year. At the time of the accident, Plaintiff had a life expectancy of 11.9 years ($1400. X 11.9 = 16,600). Plaintiff argued that he is prescribed Decloxizine for anxiety at an out-of-pocket cost of $530. per year, and the Court should award

---

[7] Plaintiff also testified that he suffered some anxiety/stress related to the litigation process. This is not compensable, but does offer hope that when the litigation ends, he will have less anxiety/stress overall.

12

him approximately 50% for this expense. Although the Court finds Plaintiff has ongoing risks related to Defendant's conduct and that these ongoing risks will cause Plaintiff some amount of anxiety and stress, the Court does not find sufficient certainty with respect to the amount of future anxiety or stress or the need for medication for the same to make an award in this regard. In addition to the medical costs, the Plaintiff has endured pain, suffering, mental anguish, and loss of enjoyment of life all as a result of the Defendant's conduct.

The Court awards Plaintiff $ 100,000. for past medical expenses

$ 16,600 for out of pocket medication charges[8]

$ 250,000. for pain, suffering, mental anguish, and loss of enjoyment of life, past and future.

ii.     Punitive Damages

Plaintiff also seeks punitive damages. Punitive damages may be awarded if the Plaintiff proves, by clear and convincing evidence, that the defendant's conduct was "motivated by actual ill will or was so outrageous that malice is implied." *Laux v. Harrington*, 2012 ME 18, ¶35, 38 A.3d 318.

The primary concern of the doctrine of punitive damages is to deter reprehensible conduct in society, not to benefit plaintiffs with a windfall. *Tuttle v Raymond*, 494 A.2d 1353, 1358-1360 (Me. 1985). The additional recovery afforded to plaintiffs through punitive damages serves a useful purpose as it provides "an incentive for private civil enforcement of society's rules against serious misconduct. " *Id.* at 1358. After the plaintiff has satisfied his prima facie burden on the issue of punitive damages, the fact finder still must weigh "all relevant aggravating and mitigating factors" presented by the parties, including the egregiousness of the defendant's

---

[8] Plaintiff also asked for $1,500. for his wife's hotel and food when she stayed in Portland while he was hospitalized. However, the Court has not awarded any amount for this because, while the hotel stay might be compensable, the Court does not have a breakdown between the lodging and food.

conduct, the ability of the defendant to pay such an award, and any criminal punishment imposed for the conduct in question". *Id.*; *see also Hanover Insurance Co. v. Hayward*, 464 A.2d 156, 158-159 (Me. 1983). After such consideration, the decision to award punitive damages rests with the "sound discretion of the fact finder." *Tuttle*, 494 A.2d at 1359. "Aggravating factors may include whether the defendant's conduct was "intentional, wanton, malicious, reckless, or grossly negligent." Hayward, 464 A.2d at 158. "Mitigating factors may include a defendant's good faith, a defendant's lack of assets to satisfy an award of punitive damages, or any other factor indicating that an award of punitive damages would not serve a deterrent function beneficial to society." *Id.* The Court may also consider the defendant's wealth in making the award. *Id.* (the amount of the award "should bear such a relationship to the actual wealth of the defendant such that the award will serve to deter future behavior inimical to the well-being of society.").

There is no question that Defendant's conduct was absolutely outrageous, so much so that malice is implied. Society must not tolerate someone hitting someone else in the face as a result of road rage. The Court is aware and takes judicial notice of the fact that the Defendant pled nolo contendre and was convicted of assault as a result of the conduct in question. He was sentenced to 7 days in jail, a $ 300. fine and ordered to pay $1,500. in restitution. The Court has little information about the ability of the defendant to pay punitive damages. However, the Court is aware that Defendant is 51 years old and is a carpenter by trade. By appearances, he lives in a modest home. He shares the home with his fiancée and one of her children. It is unknown who owns the home. As to his ability to pay punitive damages, the Court has also considered that the Defendant suffers from mental health issues, probably anxiety, depression, and/or PTSD. The

14

Court treats the defendant's apparently modest financial means and mental health issues as mitigating factors.

Based on all the evidence presented, the Court finds that punitive damages are warranted given Defendant's conduct, but determines that the amount will be modest – not because the Defendant's conduct was not egregious, which it was – but because of the mitigating factors listed above. The Court awards Plaintiff $ 10.000. in punitive damages.

## 2. Maine Civil Rights Act

The Maine Civil Rights Act provides:

> Whenever any person, whether or not acting under color law, intentionally interferes or attempts to intentionally interfere by physical force or violence against a person, damage or destruction of property or trespass on property or by the threat of physical force or violence against a person, damage or destruction of property or trespass on property with the exercise or enjoyment by any other person of rights secured by the United States Constitution or the law of the United States or of rights secured by the Constitution of Maine or laws of the State or violates section 4684-B, the person whose exercise or enjoyment of these rights has been interfered with, or attempted to be interfered with, may institute and prosecute in that person's own name and on that person's own behalf a civil action for legal or equitable relief.

5 M.R.S. § 4682(1-A). The Court is not satisfied that Plaintiff has met his burden of proof on this count. Plaintiff's MCRA claim is premised upon demonstrating that the Defendant interfered with his rights to enter the Boy Scouts building. However, the Plaintiff himself plainly and clearly testified that his path was not blocked.[9] In addition to Plaintiff's clear testimony that Defendant did not block his path, Plaintiff did not provide any details in his testimony about attempting to pass by the Defendant and not being able to do so. There was no testimony from anyone that there

---

[9] After clearly testifying that his path was not blocked by the Defendant, Plaintiff then reversed course and agreed with his attorney that the Defendant was in his way to get to the door of the Scouts office. Plaintiff's attorney then argued that Defendant blocked Plaintiff's way into the building. The Court finds Plaintiff's change in direction and subsequent argument not persuasive.

was any back-and-forth movement between Plaintiff and Defendant indicating that Defendant was blocking Plaintiff's path. Therefore, the Court does not find that Plaintiff has established that his path into the building was blocked by the Defendant.

Judgment is entered for the Defendant on Count IV.

### 3. Negligence

Unlike "assault and battery," negligence is not an intentional tort. To recover on a negligence claim, "the plaintiff must prove that it is more likely than not that: (1) the defendant was negligent, and (2) the defendant's negligence was a [proximate] cause of the plaintiff's injury and consequent damages. Alexander, *Maine Jury Instruction Manual* § 7-61 (2022 ed. Lexis Nexis). "Negligence" is the failure to use ordinary care under the circumstances[.] *Id.* "When there is substantial certainty that injury will result from an act or when there is a deliberate act to cause the injury, that act is not a negligent act. It is an intentional act." *Landry v. Leonard*, 1998 ME 241, ¶ 14, 720 A.3d 907. In finding that Mr. Nason committed "assault and battery," the Court found that he engaged in an intentional act: he intentionally hit the Plaintiff. Accordingly, a finding of negligence is precluded in this case. *See Landry v. Leonard*, 1998 ME 241 ¶ 15, 720 A.3d 907 (holding that a finding of negligence is 'excluded' because the defendant engaged in the intentional act of robbing the plaintiff.).[10] See also *Perreault v. Maine Bonding & Cas. Co.*, 568 A.2d 1100 (Me. 1990) ("certain criminal acts are so inherently likely to result in injury, that the intent to cause the injury is found 'as a matter of law.'")

Judgment is entered for the Defendant on Count V.

---

[10] While the Law Court remarked in *Landry* that it might be possible for a situation to exist when a finding of intentional conduct would not preclude a finding of negligence, *Landry*, 1998 ME 241, ¶ 15, 720 A.2d 907, the Court is not satisfied that that hypothetical situation is present here.

16

## 4. Defamation

To prove defamation, the plaintiff must prove by a preponderance of the evidence:

1. a false and defamatory statement concerning another;
2. an unprivileged publication to a third party;
3. fault amounting at least to negligence on the part of the publisher; and
4. either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*Waugh v Genesis Healthare LLC,* 2019 ME 179, ¶ 10, 222 A.3d 1063; *Morgan v. Kooistra,* 2008 ME 26, ¶ 26, 941 A.2d 447; *see also* RESTATEMENT (SECOND OF TORTS) § 558 (1977).

Because truth is always a defense, a defamation defendant is "entitled to know precisely what statement is attributed to him [and the court has] always require[ed] that the words must be proved strictly as alleged."[11] *Picard v. Brennan,* 307 A.2d 833, 835 (Me. 1973). This means that the complaint must allege the particular defamatory statement attributed to the defendant and the plaintiff must then, at trial, "strictly" prove the defamatory statement as alleged in the complaint. *Id; see also Lester v. Powers,* 596 A.2d 65, 68 n.4 (Me. 1991); *Smith v. Heritage Salmon,* 180 F. Supp. 2d 208, 221(D. Me. 2002) (holding under Maine law and with reference to *Picard,* 30 A.2d at 834-35, that a defendant was entitled to summary judgment on a defamation claim where the only evidence the plaintiff submitted to show the defendant made a false statement was an allegation that four of the defendant's employees "discussed the reasons for firing them").

With respect to the allegedly defamatory statements in this case, the complaint merely alleges that the Defendant made statements about Plaintiff on the day of the altercation in the parking lot and that "[t]he statements included references to Plaintiff as a bad driver, that he cut Defendant off while driving, that he committed traffic infractions or crimes, and that he had an

---

[11] In this context, the word "strictly" means that the plaintiff must prove the "material words" of the purported defamatory statement as alleged in the complaint. *Id.*

17

aversion or dislike for Plaintiff regarding his driving activities." (Am. Compl. ¶ 37). These allegations are not precisely stated. Because the allegations are not precisely stated in the complaint, the Plaintiff necessarily cannot "strictly" prove the purported defamatory statements "as alleged," as required by Maine law. *Picard*, 307 A.2d at 835. For this reason alone, Judgment should be entered in favor of the Defendant on this count. *See Lester*, 596 A.2d at 68 n.4, *Picard*, 307 A.2d at 835.

Even if Plaintiff had alleged and proven the purported defamatory statements with the requisite precision, Plaintiff would not be able to hold the Defendant liable for defamation. As noted earlier, truth is always a defense to defamation. First, the Court is satisfied that on the day in question Plaintiff made a driving maneuver that caused Defendant to have to take evasive action. Thus, Plaintiff's vague allegations that Defendant made statements that Plaintiff "cut Defendant off while driving" and that he committed traffic violations– have not been proven false. Additionally, Plaintiff's allegations that Defendant made statements that Plaintiff was a "bad driver" and that Defendant had a dislike for Plaintiff for his driving activities are not actionable because the alleged utterances are expressions of opinion, rather than fact. To be actionable, "[a] defamation claim requires a statement--i.e., an assertion of fact, either explicit or implied, and not merely an opinion, provided the opinion does not imply the existence of undisclosed defamatory facts." *Lester v. Powers*, 596 A.2d 65, 69 (Me. 1991). Said differently, a purportedly false and defamatory statement concerning the plaintiff can only provide a basis for relief under the defamation tort, if the statement is a statement of fact— "Maine's common law of defamation does not allow recovery for statements of opinion alone[.]" *Lester*, 596 A.2d at 71.[12]

---

[12] This requirement has its roots in the protection afforded the expression of ideas by the first amendment [sic]."
*True v. Ladner*, 513 A.2d 257, 261 (Me. 1986).

18

Finally, Plaintiff has not established that he suffered any harm due to the statements made by the Defendant. Plaintiff did not present any evidence that the people connected with the Boy Scouts, the police, or anyone else thought less of the Plaintiff due to Defendant's allegedly defamatory statement(s).

Judgment is entered for the Defendant on Count VI.

The docket entry shall be:

Count I – Judgment Plaintiff in the amount of $ 376,600 ($366,600 + $10,000.).

Count II- Dismissed by the Court upon the Plaintiff's Motion and with the consent of the Defendant during trial.

Count III- Dismissed by the Court upon the Plaintiff's Motion and with the consent of the Defendant during trial.

Count IV – Judgment for the Defendant.

Count V – Judgment for the Defendant.

Count VI- Judgment for the Defendant.

Plaintiff did not pursue Counts VII, VIII, and IX in the Amended Complaint and those Counts are dismissed for lack of prosecution.

The Clerk is directed to incorporate this Order into the docket by reference pursuant to M.R. Civ. P. 79(a).

Dated: **07/25/2022**

Ann M. Murray
Justice, Maine Superior Court

ORDER/JUDGMENT ENTERED IN THE
COURT DOCKET ON: 7-26-2022

19